FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Jul 23, 2024

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| TANKMAX, INC., a Washington Corporation,<br><br>    Plaintiff,<br><br>    v.<br><br>WAYNE DURAN, an individual and AMERICAN GAS SERVICES, LLC, a Washington Limited Liability Company,<br><br>    Defendants. | No.  2:22-CV-00101-SAB<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

A bench trial in the above-captioned case was held on March 11, 2024, through March 14, 2024, in Spokane, Washington. Plaintiff was represented by Ronald Van Wert and Samir Dizdarevic-Miller. Defendants were represented by James Bulthuis.

**I.    Nature of proceedings and statement of jurisdiction**

Plaintiff Tankmax, Inc. ("Tankmax") asserted the following claims against Defendants Wayne Duran and American Gas Services, LLC "("AGS"): (1) violation the Washington Uniform Trade Secrets Act, RCW 19.108, *et seq*. ("WUTSA"); (2) violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 ("DTSA"); (3) tortious interference with business relationships; (4) unjust enrichment; (5) breach of fiduciary duties; (6) conversion; and (7) violation of the

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 1**

Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA"). The foregoing claims arise from Mr. Duran's conduct during his employment with Tankmax and following his resignation from Tankmax on January 3, 2024. Defendants deny all claims for liability, and they contest damages.

## II.     Jurisdiction

This Court has jurisdiction over this matter under 28 U.S.C. § 1331 based on Tankmax's claims asserted under 18 U.S.C. §§ 1030 & 1836. In addition, this Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

## III.    Findings of Fact

1. Plaintiff Tankmax, Inc. is a Washington corporation formed in 2016 by Jack Lacher, his wife Kelly Howard, and Pacific Truck Tank.

2. In November 2019, Mr. Lacher began managing, in part, Pacific Meter & Equipment Inc., ("PME") located in Kent, Washington.

3. PME's sole physical location was a shop in Kent, Washington.

4. Defendant Wayne Duran is a propane mechanic who worked for Pacific Meter & Equipment Inc. ("PME") in Kent, Washington, from 2003 to March 2021. Mr. Duran became an employee of Tankmax in 2021.

5. Defendant American Gas Services, LLC ("AGS") is a Washington limited liability company headquartered in Kent, Washington. AGS is solely owned by Mr. Duran.

6. Tankmax builds propane and petroleum trucks, offers repairs to propane and petroleum trucks and cargo tanks, offers DOT inspections, and sells parts to customers, among other services. Tankmax is headquartered in Spokane Valley, Washington, and has branches throughout Eastern Washington including the Tri-Cities, Spokane Valley, and Sunnyside.

7. On June 30, 2021, Tankmax entered into a Stock Purchase Agreement with PME, effective, retroactively, to May 31, 2021.

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 2

8. Tankmax's purchase of PME included all PMEs assets.

9. Tankmax distributed new hire packets to all PME employees in April 2021, in preparation of Tankmax's purchase of PME. The new hire packets included Tankmax's Employee Handbook dated November 2019. The evidence is disputed and inconclusive whether Mr. Duran received a copy of the new hire packet.

10. Tankmax's Employee Handbook defined "equipment, vehicles, telephones, computers, and software" as "Company Property," and provided that Tankmax had the right to access all company property at any time.

11. After Tankmax purchased PME, Mr. Lacher implemented a mobile-based operation at PME's former Kent location.

12. Mr. Duran is married and a resident of King County, Washington.

13. Mr. Duran is a registered inspector with the Department of Transportation ("DOT").

14. The DOT requires inspections of certain propane equipment at regular intervals, typically every year or every five years depending on the inspection performed. 49 CFR 180.407. Such inspections are required to be performed by a Registered Inspector. 49 CFR 180.409.

15. Following each inspection, the inspector is required to "durably and legibly" mark the inspected vehicle or equipment with the date of the inspection and type of inspection performed, among other information. 49 CFR 180.415. 8. Tankmax provided Mr. Duran a decal to place on tanks and equipment after the inspection to mark the required information. On the decal, Mr. Duran would provide information including Mr. Duran's license number, Tankmax's name, the type of inspection performed, and the date performed.

16. The decal that Tankmax provided, and Mr. Duran used, contained the same substantive information as inspection decals used by competitors offering inspection services.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 3**

17. The decals are required to be publicly visible by being affixed near the "specification plate," which is a location easily visible to the public. 49 CFR 180.415. As a result, the type of inspection performed, and its date is public knowledge. A company offering inspection services can discover the type of inspection and its inspection date by simply looking at the decal. Because inspections are mandated by the DOT to occur at certain intervals, the deadline for upcoming inspections is easily ascertainable by competitors in the propane inspection industry. The inspection deadlines are not unique to the customer, each customer is required to abide by the DOT's timelines for inspections.

18. In addition to placing the inspection sticker on the tank or vehicle, the Registered Inspector must complete an inspection report. 49 CFR 180.417(b). The inspection report must identify the customer's name, the serial number of the vehicle or tank inspected, the type of inspection performed, the date, the contact information of the inspector, the Registered Inspector's DOT license number, and other information.

19. The inspection report is provided to the customer, who is required by code to retain the inspection report until the next inspection, and for a year thereafter. 49 CFR 180.417(c)(2).

20. If repairs were performed during the inspection, the Registered Inspector must complete a report containing the same information and describe the repairs. 49 CFR 413. 14. At any point in time, the DOT may request copies of the inspection reports. 49 CFR 180.517(b)(tank cars).

21. When the customer sells or leases the vehicle or tank, they are required to provide the inspection reports to the buyer or lessee. 49 CFR 417(d).

22. Tankmax retained copies of inspection reports prepared by Mr. Duran during his employment. Tankmax used these inspection reports to prepare invoices that it sent to the customers for Mr. Duran's inspections. Mr. Duran was not provided copies of the invoices. Mr. Duran did not deliver the invoices to

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 4

customers; Tankmax personnel would send the invoices to the respective customers.

23. In addition to preparing the invoices, a Tankmax employee, Kelly Martinez, created a spreadsheet tracking all inspections performed by Mr. Duran starting in April 2021. Mr. Duran was not shown or provided this spreadsheet.

24. Instead, Mr. Duran handwrote on a notecard the customer truck number, the type of inspection and the date of inspection. Mr. Duran developed this process of organization while employed by PME.

25. Mr. Lacher traveled to the PME location in Kent before Tankmax closed on its acquisition of PME. At the time, Mr. Duran was still working inside of the shop. Mr. Lacher saw the notecards that Mr. Duran used and asked Mr. Duran to throw them away because, he explained, Tankmax would track inspections digitally.

26. Mr. Duran was not very savvy with computers. So, he took the notecards home and continued his handwritten note-taking on the cards while he continued inspecting tanks as a mobile propane prover.

27. Tankmax did not request Mr. Duran return the notecards or card file before filing this lawsuit.

28. The information on the notecards kept by Mr. Duran is the same information contained on the public-facing decals, the information contained in the spreadsheet maintained internally by Tankmax, and the inspection reports provided to the customers and retained by Tankmax.

29. Tankmax did not provide Mr. Duran with an employment contract. Mr. Duran was an at-will employee.

30. Mr. Duran was never asked to sign a non-compete, non-solicitation or confidentiality agreement with Pacific Meter or Tankmax.

31. Mr. Duran was transitioned from shop foreman of PME's Kent location to a Tankmax mobile prover position in April 2021.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 5**

32. As mobile prover manager, Mr. Duran's job duties included, but were not limited to, traveling to customer locations to test, calibrate, and repair propane equipment; set up and manage company test schedules for designated locations; and to test and inspect cargo tanks in compliance with Department of Transportation ("DOT") standards.

33. Following Mr. Duran's promotion to mobile prover, he spent ninety percent of his time outside of the shop, servicing customers in Washington, Oregon, and Idaho.

34. Mr. Duran's job duties as mobile prover included, but were not limited to, traveling to customer locations to test, calibrate and repair propane equipment, and test and inspect cargo tanks in compliance with DOT standards.

35. In the summer of 2021, Tankmax provided Mr. Duran with an iPhone that shipped directly to him from Verizon. The phone plan was paid for by PME during his employment.

36. Tankmax directed Mr. Duran to set up an Apple ID for the Tankmax iPhone using his Tankmax e-mail address. Unbeknownst to Tankmax, Mr. Duran ignored this instruction and instead used his personal e-mail address in setting up the Apple ID.

37. The information from Mr. Duran's PME phone was downloaded to the Tankmax iPhone, including compiled customer information. When scheduling services with customers in his role as a Tankmax employee, Mr. Duran used the contact information maintained on the iPhone.

38. Mr. Duran purchased a new iPhone for AGS. Mrs. Duran set up the AGS iPhone using the same Apple ID that was used for his Tankmax iPhone. By using the same AppleId, the contact information that Mr. Duran developed over the last 25+ years was imported into the AGS iPhone.

39. Mr. Duran disliked computers. As such, he kept track of PME's and, subsequently, Tankmax's customers and when they needed inspections completed

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 6

by using the card file. Mr. Duran was the only individual in possession of the card file at the time Tankmax purchased PME.

40. The card file was kept in the Kent shop while Mr. Duran worked as shop foreman. After he became a mobile prover, Mr. Duran took the card file to his home, where he continues to use it to this day.

41. Mr. Duran kept a day planner detailing work scheduled with Tankmax customers.

42. The evidence is disputed and inconclusive whether Mr. Duran used his AGS phone to contact Tankmax customers for the benefit of AGS.

43. At some point after being promoted to mobile prover, Mr. Duran began planning to resign from his position at Tankmax and start a competing company, American Gas Service.

44. On October 22, 2021, Mr. Duran registered his business, American Gas Services LLC in Washington.

45. Mr. Duran resigned from his employment with Tankmax, giving Tankmax one hour's notice. He gave no notice to Tankmax, other than calling Tankmax's operations manager, Brian Dempsey, at roughly 3:45 p.m., on January 3, 2022, to advise that he was ending his employment with Tankmax and starting his own business. Mr. Dempsey asked whether Mr. Duran would consider buying parts from Tankmax with his new venture.

46. After calling Mr. Dempsey to terminate his employment, Mr. Duran then called several customers to advise of his new business venture.

47. Mr. Duran knew that several of the customers had work that would need to be done in the near future based on parts orders he previously fulfilled for them on behalf of Tankmax in the weeks prior.

48. On January 4, 2022, Mr. Duran serviced two customers in Central Washington on behalf of AGS.

49. Mr. Duran did not notify customers before January 3, 2022, that he

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 7

formed his own business or planned to leave Tankmax.

50. The evidence is inconclusive whether Mr. Duran scheduled work for customers prior to terminating his employment with Tankmax.

51. Mr. Duran did not start to perform inspections for customers on behalf of AGS until the second half of January 2022.

52. At all times, Mr. Duran used one phone, for both personal and work. PME and Tankmax management knew this.

53. The phone number that Mr. Duran used was his personal phone number for at least two decades.

54. Before starting work for PME in 2003, Mr. Duran worked for a competitor, Western Cascade for approximately five years. During that time, Mr. Duran inputted the names and phone numbers of customers into his personal phone. This was done for convenience in contacting them for work as well as for personal reasons, *i.e.*, Mr. Duran became friends with several of his customer contacts.

55. When Mr. Duran started work for PME in 2003, he contacted customer contacts from his personal phone to notify them that he switched to PME. Nearly a dozen such customers followed Mr. Duran to PME.

56. During the last few years of his employment with PME, the company paid for Mr. Duran's monthly cell service bill. However, PME did not pay for Mr. Duran's cell phone device. The phone remained his personal phone.

57. Mr. Duran's cell phone contacts were saved to a Google-Drive account associated with his personal email address.

58. After Mr. Duran became a Tankmax employee, he initially continued using the same personal cell phone device. Tankmax continued paying his monthly wireless service bill as PME had previously.

59. In the summer of 2021, Mr. Duran's cell phone was damaged, and Tankmax paid for a replacement cell phone device. Tankmax had an Apple iPhone

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 8

shipped directly from a Verizon store to the Kent shop to be provided to Mr. Duran.

60. Tankmax did not setup or install software on the iPhone. Tankmax did not load customer contacts onto the iPhone provided to Mr. Duran. Tankmax did not request, and did not explain how, Mr. Duran would load the contact information of customers from his personal phone onto the Tankmax-provided iPhone.

61. Tankmax employee Kim Dempsey testified that she instructed Mr. Duran to set up an AppleId account using his Tankmax email address. Mr. Duran disputes this. Ms. Dempsey did not inform Mr. Duran why a Tankmax email address was to be used, and she did not inform Mr. Duran that using the Tankmax email address would enable Tankmax to have its own copy of Mr. Duran's phone contacts and other data.

62. Mr. Duran setup an AppleId for the iPhone using his personal Gmail address. This enabled him to migrate his contacts to the iPhone from his Google account.

63. Because Mr. Duran used the iPhone for personal and work purposes, the iPhone contained Mr. Duran's personal banking information. The iPhone contained contact information for Mr. Duran's friends and family members. The iPhone contained photographs taken by Mr. Duran and other personal information.

64. Tankmax never checked to see if Mr. Duran set up an AppleId using his Tankmax email address while Mr. Duran was employed with Tankmax.

65. Tankmax never checked Mr. Duran's iPhone and never saw the contacts on his iPhone.

66. Tankmax did not instruct Mr. Duran or other Tankmax employees that they could not change their phones' settings.

67. Before Mr. Duran returned the iPhone, laptop, and other equipment to Tankmax, he restored the iPhone to factory settings.

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 9

68. Tankmax never instructed Mr. Duran that he could not delete data from the iPhone. Tankmax never expressed to Mr. Duran that his authorization to use the iPhone or laptop was revoked.

69. When Mr. Duran returned the iPhone to the PME location in Kent, on January 5, 2022, he informed Tankmax branch manager, Destiny Solid, that he had reset the iPhone to factory settings, thereby deleting all it contents. He also told Ms. Solid that if she needed any customer's phone number, he would provide it.

70. After Mr. Duran terminated his employment, Tankmax assigned Mr. Duran's phone to Tankmax employee, Adam Wright. Customers called Mr. Wright thinking they were calling Mr. Duran.

71. Mr. Duran was provided a laptop by PME and used the same laptop after becoming a Tankmax employee.

72. Mr. Duran did not track customer scheduling using the laptop.

73. Mr. Duran did not load customer contact information to the laptop or its programs. Similarly, PME and Tankmax did not load customer contact information or scheduling onto the laptop.

74. On January 5, 2022, Mr. Duran returned to Tankmax a laptop, tablet, and iPhone, all of which were Tankmax's property.

75. Mr. Duran uploaded all the information on the Tankmax iPhone, including Tankmax's customer contact information, to his personal Apple ID, which information he subsequently downloaded to his AGS phone.

76. Mr. Duran did not return the card file to Tankmax because Jack Lacher had previously told him to destroy it.

77. The evidence is disputed and inconclusive as to whether Mr. Duran returned certain tools and equipment to Tankmax following his resignation, including pipe taps, pipe wrenches, propane and petroleum pressure gauges, propane prover fittings, gas bottles, a propane burner, and a truck-mounted hose reel.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** ~ 10

78. In May 2022, AGS hired former Tankmax's former employee Adam Wright to work for AGS.

79. Mr. Wright sought employment from AGS and Mr. Duran.

80. Mr. Duran did not encourage Mr. Wright to leave Tankmax to come work for him.

81. Tankmax never provided Mr. Duran with a customer list to use for his job.

82. Tankmax did not maintain a compiled "customer list" containing customer contact information or scheduling calendars in one file or document for the customers whom Mr. Duran serviced while he worked for Tankmax.

83. Tankmax did not request Mr. Duran provide it with the phone contacts or the notecards prior to this lawsuit being filed.

84. A few months after Mr. Duran left Tankmax, Tankmax sent correspondence to all customers requesting the customers provide updated contact information.

85. Despite having customer contact information for numerous customers, Tankmax never called customers to secure their inspection or mobile propane repair work.

86. Tankmax knew the names of several points of contact for numerous customers after Mr. Duran left. Tankmax never called these specific contacts to secure their inspection or mobile propane repair work.

87. The contact information on Mr. Duran's iPhone consisted of a customer name and their phone number. Most, if not all, such information is freely available to the public and may be ascertained through internet searches.

88. Tankmax has never seen the customer list it accuses Mr. Duran of stealing.

//

//

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 11

IV.    Conclusions of Law

    1.    **Washington Uniform Trade Secrets Act (WUTSA)**

    1.1.    The Washington Uniform Trade Secrets Act (WUTSA), Wash. Rev. Code § 19.108, "codifies the basic principles of common law trade secret protection" by which a plaintiff can receive damages for misappropriation of trade secrets. *Ed Nowogroski Ins., Inc. v. Rucker*, 137 Wash.2d 427, 438 (1999).

    1.2.    Wash. Rev. Code § 19.108.010(4) defines "trade secret" as

> information, including a formula, pattern, compilation, program, device, method, technique, or process that:
>     (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and
>     (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

    1.3.    To have a legally protectable interest in trade information, a party must establish that (1) the information derives independent economic value from not being generally known or readily ascertainable to others who can obtain economic value from knowledge of its use and (2) reasonable efforts have been taken to maintain the secrecy of the information. *Modumental, Inc. v. Xtalic Corp.*, 4 Wash.App.2d 810, 823 (2018) (citation omitted).

    1.4.    The evidence failed to establish that the phone contacts alone derived independent economic value.

    1.5.    A list of names and phone numbers, without more, is not a trade secret because such a list is not novel, unique, or innovative.

    1.6.    Tankmax did not create the list of names and phone numbers and did not provide this information to Mr. Duran. Instead, Mr. Duran created this list on his own both before he was employed by Tankmax and during his employment with Tankmax. Tankmax never asked for this information from Mr. Duran and never instructed him to keep it confidential.

1.7. Tankmax did not claim the card file was a trade secret, and, on the contrary, instructed Mr. Duran to destroy it and instead rely on information stored electronically on his laptop.

1.8. Tankmax did not make reasonable efforts to safeguard the customer information located on Mr. Duran's cell phone. Tankmax did not instruct Mr. Duran to provide Tankmax with the customer information when he resigned his employment.

1.9. Tankmax did not require Mr. Duran to sign a non-competition agreement, a non-solicitation agreement or a confidentiality agreement.

1.10. Consequently, Tankmax has not proven the elements of the WUTSA claim by a preponderance of the evidence.

2. **Defense of Trade Secrets Act (DTSA), 18 U.S.C. § 1839(5)**

2.1. To succeed on a claim for misappropriation of trade secrets under the DTSA, Tankmax must prove by a preponderance of the evidence that: (1) Tankmax possessed a trade secret, (2) Mr. Duran misappropriated the trade secret; and (3) the misappropriation caused or threatened damage to Tankmax. See 18 U.S.C. § 1839(5); *InteliClear LLC v. ETC Global Holdings, Inc.*, 978 F.3d 653, 657-58 (9th Cir. 2020).

2.2. The DTSA defines trade secret as:

> (3) all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—
> (A) the owner thereof has taken reasonable measures to keep such information secret; and
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information;

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 13**

18 U.S.C. § 1839(3).

2.3.  The definition of what may be considered a "trade secret" is broad. *Inteliclear LLC*, 978 F.3d at 657-58.

2.4.  Federal DTSA claims are substantially similar to claims asserted under the Washington Uniform Trade Secrets Act. *NW Monitoring LLC v. Hollander*, 534 F.Supp.3d 1329, 1335 (W.D. Wash. 2021); *Philips N. Am., LLC v. Summit Imaging Inc.*, 2020 WL 1515624, at *5 (W.D. Wash. Mar. 30, 2020).

2.5.  For the reasons stated above, Tankmax has not shown it has a legally protectable interest in the customer lists that were located on Defendant's cell phone.

2.6.  Tankmax has not proven the DTSA claim by a preponderance of the evidence.

### 3. Tortious Interference with Business Expectancy

3.1.  To prevail on a claim of tortious interference with a business expectancy, Tankmax must prove five elements: (1) the existence of a valid contractual relationship or business expectancy; (2) Mr. Duran had knowledge of that relationship; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4) Mr. Duran interfered for an improper purpose or used improper means; and (5) resultant damage. *Moore v. Commercial Aircraft Interiors, LLC*, 168 Wash.App. 502, 508-09 (2012).

3.2.  Only after Tankmax establishes the five elements of the tort does the burden shift to Mr. Duran and AGS to show, as an affirmative defense, that their interference was either privileged or justified. *Pleas v. City of Seattle*, 112 Wash.2d 794, 804 (1989).

3.3.  The evidence is insufficient regarding whether Mr. Duran acted for an improper purpose or used improper means. All acts taken by Mr. Duran after he resigned from Tankmax were legitimate acts of competition between business competitors.

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 14

3.4. The allegations that Mr. Duran acted improperly before he resigned from Tankmax by contacting Tankmax's existing customers were not proven by a preponderance of the evidence.

3.5. The claim for tortious interference with a business expectancy was not proven by a preponderance of the evidence.

### 4. Unjust Enrichment

4.1. Unjust enrichment is the method of recovery for the value of the benefit retained absent any contractual relationship because notions of fairness and justice require it. *Young v. Young*, 164 Wash.2d 477, 483 (2008). In such situations a quasi-contract is said to exist between the parties. *Id*. (citation omitted).

4.2. To show unjust enrichment Tankmax must prove three elements: (1) Mr. Duran received a benefit, (2) the received benefit is at Tankmax's expense, and (3) the circumstances made it unjust for Mr. Duran and AGS to retain the benefit without payment. *Id.*

4.3. Mr. Duran did not act in an unjust manner when he contacted Tankmax's customers after he resigned his employment with Tankmax. These contacts were legitimate acts of competition between business competitors.

4.4. Tankmax did not prove its claim of unjust enrichment by a preponderance of the evidence.

### 5. Breach of Fiduciary Duty/ Loyalty

5.1. To establish a claim for breach of fiduciary duty/loyalty, Tankmax must prove: (1) existence of a duty owed; (2) breach of that duty; (3) resulting injury, and (4) that the claimed breach proximately caused the injury. *Miller v. U.S. Bank of Wash. N.A.*, 72 Wash.App. 416, 426 (1994). Whether an individual owes a legal duty is a question of law, whereas breach of a legal duty is generally a question of fact. *Lodis v. Corbis Holdings, Inc.*, 172 Wash.App. 835, 859 (2013).

5.2. During the period of employment, an employee has a duty to refrain from soliciting customers for a rival business or to act in direct competition with

his or her employer's business. *Kieburtz v. Assoc's v. Rehn*, 68 Wash.App. 260, 265 (1992).

 5.3. Tankmax failed to show that Mr. Duran had a fiduciary duty to it.

 5.4. Although Mr. Duran had a duty of loyalty to Tankmax while he was employed by Tankmax, the facts are disputed and inconclusive whether Mr. Duran breached that duty prior to terminating his employment with Tankmax.

 5.5. The claim for breach of a duty of loyalty was not proven by a preponderance of the evidence.

**6. Conversion**

 6.1. A conversion claim under Washington law requires proof by a preponderance of the evidence that Mr. Duran, without lawful justification, willfully interfered with, and thereby deprived Tankmax, of its right to a chattel, or personal property. *Davenport v. Wash. Educ. Ass'n,* 147 Wash.App. 704, 721 (2008).

 6.2. The evidence is disputed and inconclusive whether Mr. Duran deprived Tankmax of personal property without lawful justification.

 6.3. Tankmax failed to prove its claim for conversion by a preponderance of the evidence.

**7. Computer Fraud and Abuse Act, 18 U.S.C. § 1030**

 7.1. To bring an action successfully under 18 U.S.C. § 1030(g) based on a violation of 18 U.S.C. § 1030(a)(2), Tankmax must show Mr. Duran: (1) intentionally accessed a computer, (2) without authorization or exceeding authorized access, and that Mr. Duran (3) thereby obtained information (4) from any protected computer (if the conduct involved an interstate or foreign communication), and (5) there was loss to one or more persons during any one-year period aggregating at least $5,000 in value.

 7.2. To bring an action successfully under § 1030(g) based on a violation of § 1030(a)(4), Tankmax must show that Mr. Duran: (1) accessed a protected

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 16

computer (2) without authorization or exceeding such authorization that was granted (3) knowingly and with intent to defraud, and thereby (4) furthered the intended fraud and obtained anything of value, causing (5) a loss to one or more persons during any one-year period aggregating at least $5,000 in value. *LVRC Holdings, LLC v. Brekka*, 581 F.3d 1127, 1133 (9th Cir. 2009).

 7.3. An employer gives an employee "authorization" to access a company computer when the employer gives the employee permission to use it. On the other hand, the term "exceeds authorized access" means to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter. 18 U.S.C. § 1030(e)(6). Thus, an individual who is authorized to use a computer for certain purposes but goes beyond those limitations is considered by the CFAA as someone who has "exceeded authorized access." *LVRC Holdings, LLC*, 581 F.3d at 1133. Therefore, an employee can violate employer-placed limits on accessing information stored on the computer and still have authorization to access that computer. *Id.*

 7.4. A person uses a computer "without authorization" under §§ 1030(a)(2) and (4) when the person has not received permission to use the computer for any purpose (such as when a hacker accesses someone's computer without permission), or when the employer has rescinded permission to access the computer and the defendant uses the computer anyway. *Id.*

 7.5. There is no evidence that Mr. Duran acted with the intent to defraud Tankmax.

 7.6. There is no evidence that Mr. Duran used his cell phone without authorization.

 7.7. Tankmax's claim for violation of 18 U.S.C. § 1030 is not proven by a preponderance of the evidence.

//
//

Accordingly, **IT IS HEREBY ORDERED**:

1. The Clerk of Court is directed to enter judgment in favor of Defendants and against Tankmax.

**IT IS SO ORDERED**. The Clerk of the Court is hereby directed to file this Order, provide copies to counsel, and close the file.

**DATED** this 23rd day of July 2024.



_____
Stanley A. Bastian
Chief United States District Judge

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 18**